**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERMICHAEL A. MCCALL,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO. 18-00382-B** |
| | * | |
| **ANDREW M. SAUL,** | * | |
| **Commissioner of Social** | * | |
| **Security,** | * | |
| | * | |
| **Defendant.** | * | |

<u>**ORDER**</u>

Plaintiff Jermichael A. McCall (hereinafter "Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.* On October 9, 2019, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 17). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 21). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I.  **Procedural History**[1]

Plaintiff filed his application for benefits on August 11, 2015, alleging disability beginning August 10, 2015, based on narcolepsy, depression, and anxiety.  (Doc. 10 at 178, 196). Plaintiff's application was denied at the initial stage, and upon timely request, he was granted an administrative hearing before Administrative Law Judge Ruth Ramsey (hereinafter "ALJ") on July 21, 2017.  (Id. at 34, 97, 105, 137).  Plaintiff, who was represented by counsel, appeared at the hearing from Selma, Alabama and provided testimony related to his claims.  (Id. at 36-55).  A vocational expert (hereinafter "VE") also appeared at the hearing and provided testimony.  (Id. at 53-54, 56-59).  On December 12, 2017, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 13-24).  The Appeals Council denied Plaintiff's request for review on August 17, 2018.  (Id. at 4). Therefore, the ALJ's decision dated December 12, 2017 became the final decision of the Commissioner.  (Id.).

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and

---

[1] The Court's citations to the transcript in this order refer to the pagination assigned in CM/ECF.

1383(c)(3).

## II.  Issue on Appeal

> 1. **Whether the ALJ reversibly erred in affording partial weight to the opinions of Plaintiff's treating neurologist, and little weight to the opinion of the consultative medical examiner and to letters from Plaintiff's former employers?**

## III. Factual Background

Plaintiff was born on January 13, 1991 and was twenty-six years of age at the time of his administrative hearing on July 21, 2017.  (Doc. 10 at 178).  At the time of his hearing, Plaintiff lived with his mother and two younger siblings.  (Id. at 38-39). Plaintiff testified that he had a sleeping disorder while in high school but was able to complete his classes and graduate.  (Id. at 41).  Plaintiff has limited work experience, but he has worked as a garbage collector, at a truck stop, as a laborer for a trucking company, and performing data entry.  (Id. at 54-55, 215-17, 334). He last worked in July 2015.  (Id. at 228).  Plaintiff testified that the only reason he is unable to work is that he is narcoleptic and unable to stay awake.  (Id. at 43, 46).  According to Plaintiff, he has a driver's license but has not driven in eight to ten years because of his narcolepsy.  (Id. at 40-41).  Plaintiff has been diagnosed with narcolepsy and sleep apnea.  (Id. at 340).  He uses a continuous positive airway pressure ("CPAP") machine nightly for his sleep apnea.  (Id. at 50).  He has been prescribed medication

for his narcolepsy and sleep apnea.  (Id. at 348, 350).  At the hearing, Plaintiff testified that he was taking medication for depression and anxiety but he was no longer taking the medication prescribed for his narcolepsy because he "didn't have any funds to purchase it anymore."  (Id. at 44-46).

## IV.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the correct legal standards were applied.[2]  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  In determining whether substantial evidence exists,

---

[2] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

a reviewing court must consider the record as a whole, taking into account evidence both favorable and unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, at *4 (S.D. Ala. June 14, 1999).

**V.    Statutory and Regulatory Framework**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. § 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining whether a claimant has proven his or her disability. See 20 C.F.R. § 416.920.

The claimant must first prove that he or she is not engaged in substantial gainful activity. Carpenter v. Comm'r of Soc. Sec., 614 F. App'x 482, 486 (11th Cir. 2015) (per curiam).[3] The second

---

[3] Federal Appendix cases are unpublished Eleventh Circuit opinions and are not considered binding precedent, but they may be cited as persuasive authority. 11th Cir. R. 36-2; Henry v. Comm'r of Soc. Sec., 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

step requires the claimant to prove that he or she has a severe impairment or combination of impairments. Id. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. Id. If the claimant cannot prevail at the third step, the ALJ must determine the claimant's residual functional capacity ("RFC") before proceeding to step four. Id. A claimant's RFC is an assessment, based on all relevant medical and other evidence, of a claimant's remaining ability to work despite his or her impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Once a claimant's RFC is determined, the evaluation proceeds to the fourth step, where the claimant must prove an inability to perform his or her past relevant work. Carpenter, 614 F. App'x at 486.

If a claimant meets his or her burden at the fourth step, it then becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's RFC, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985) (per curiam). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the burden then shifts back to the claimant to prove his or her inability to perform those

jobs in order to be found disabled.  <u>Hale v. Bowen</u>, 831 F.2d 1007,
1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562,
1564 (11th Cir. 1985)).

## VI.  <u>The ALJ's Findings</u>

In this case, the ALJ found that Plaintiff has the severe
impairments of sleep apnea, narcolepsy, and depression.  (Doc. 10
at 15).  The ALJ also found that Plaintiff has the non-severe
impairment of obesity.  (<u>Id.</u> at 16).  The ALJ found that
Plaintiff's impairments, when considered individually and in
combination, do not meet or medically equal any of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R.
§§ 416.920(d), 416.925, and 416.926).  (<u>Id.</u>).  The ALJ further
found that Plaintiff has the RFC to perform a full range of work
at all exertional levels but with the following non-exertional
limitations: he can never climb ladders, ropes, or scaffolds; he
must avoid even moderate exposure to hazards, including hazardous
machinery and unprotected heights; he can never drive a commercial
vehicle; he can perform only simple, routine tasks and must be
provided short, simple instructions; he must be allowed breaks
every two hours; he cannot work at a fixed production rate pace;
and he must be provided reminders every two hours to help keep him
on task.  (<u>Id.</u> at 18).  The ALJ found that Plaintiff has no past
relevant work.  (<u>Id.</u> at 22).  However, based upon the testimony of
the VE, the ALJ concluded that Plaintiff can perform jobs that

exist in significant numbers in the national economy, such as trash collector, crate liner, and vending machine attendant. (Id. at 22-23). Thus, the ALJ found that Plaintiff is not disabled. (Id. at 23-24).

## VII. Discussion

### A. Substantial evidence supports the ALJ's assignment of partial weight to the opinions of Plaintiff's treating neurologist and little weight to the opinions of the consultative medical examiner and Plaintiff's former employers.

Plaintiff argues that the ALJ erred in assigning partial weight to the opinions of his treating neurologist and little weight to the opinion of the consultative medical examiner and to letters submitted by two of his former employers, who stated that his employment was terminated because he could not perform required job duties due to a medical condition. (Doc. 12 at 4-6). Plaintiff contends there "is no evidence in the record that does not support these opinions." (Id. at 5). The Commissioner counters that substantial evidence supports the ALJ's assessment of the opinion evidence, and that there was good cause for the ALJ to reject the subject opinions. (Doc. 13 at 2-4). Having carefully reviewed the record in this case, the Court finds that Plaintiff's claim is without merit.

As part of the disability determination process, the ALJ is tasked with weighing the opinions and findings of treating,

examining, and non-examining physicians.  In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so.  See Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  The failure to do so is reversible error.  See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, at *4, 2009 WL 413541, at *1 (M.D. Fla. Feb. 18, 2009).

The ALJ must give "substantial weight" to the opinion of a claimant's treating physician, unless "good cause" exists for not doing so.  Costigan v. Comm'r, Soc. Sec. Admin., 603 F. App'x 783, 788 (11th Cir. 2015) (per curiam) (citing Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (per curiam)). "The opinion of a one-time examining physician" is not entitled to the same deference as that of a treating physician.  Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, at *50, 2010 WL 989605, at *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford, 363 F.3d at 1160). Also, an "ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'"  Milner v. Barnhart, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  "The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources."  Milner, 275 F. App'x at 948 (citing Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)).

Whether considering the opinions of treating, examining, or non-examining physicians, good cause to discredit the testimony of *any* medical source exists when it is contrary to or unsupported by the evidence of record. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence." Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, at *8, 2012 WL 3155570, at *3 (M.D. Ala. Aug. 3, 2012). The ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." Sryock, 764 F.2d at 835 (citation omitted); see also Adamo v. Comm'r of Soc. Sec., 365 F. App'x 209, 212 (11th Cir. 2010) (per curiam) ("The ALJ may reject any medical opinion if the evidence supports a contrary finding."). A court "will not second guess an ALJ's decision to reject a medical opinion for 'good cause' so long as the ALJ articulates a specific justification for his decision." Hernandez v. Soc. Sec. Admin., Comm'r, 761 F. App'x 901, 903 (11th Cir. 2019) (per curiam) (citing Hunter v. Comm'r of Soc. Sec. Admin., 808 F.3d 818, 823 (11th Cir. 2015)).

The record reflects that, on March 11, 2013, Plaintiff was admitted to Vaughan Regional Medical Center and underwent an exploratory laparotomy due to a gunshot wound to the left side of his chest. (Doc. 10 at 281). Radiology studies performed on March

19, 2013 showed no acute pulmonary abnormality, and Plaintiff's heart and lungs appeared unremarkable. (Id. at 321-25). Plaintiff convalesced well and was discharged on March 19, 2013. (Id. at 281-82).

On October 29, 2015, psychologist Nina E. Tocci, Ph.D. performed a consultative mental status examination of Plaintiff. (Id. at 329-31). Plaintiff told Dr. Tocci that he had undergone a sleep study once before and was diagnosed with narcolepsy and sleep apnea, that he graduated from high school in regular classes, and that he "worked data input 'every now and then' but was having significant difficulty remaining alert and awake." (Id. at 329). Plaintiff also told Dr. Tocci that he performed activities of daily living without assistance, attended church sometimes, did not drive, did not have friends, and that his day consisted of the following: "sleep I get up in the morning to find me something to eat, go back to bed or get on the couch go to sleep." (Id. at 331). Dr. Tocci noted that Plaintiff "could not recall his work history and evinced slowed cognition and impaired memory." (Id. at 329).

On examination, Plaintiff was oriented to time, place, person, and situation. (Id. at 330). He described his mood as "tired," his affect was somnolent and labile, he was fairly groomed, his motor activity was unremarkable, and he had poor eye contact and sleepy facial expressions. (Id. at 329-30). Dr. Tocci

found that Plaintiff demonstrated fair attention and concentration, a poor fund of information and comprehension, appropriate thought content and goal-directed thought organization, and some insight into his behavior. (Id. at 330). Dr. Tocci noted that Plaintiff "appeared to be functioning within the borderline range of intellectual ability." (Id.). She diagnosed Plaintiff with narcolepsy and depressive disorder due to narcolepsy, and she opined that his prognosis was guarded. (Id. at 331). In her summary, Dr. Tocci stated: "He would benefit from consistent compliance with all forms of treatment, supportive medical intervention until compliance is 90% to 100%, and counseling. He would also benefit from vocational training that will consider his medical issues." (Id.).

On November 4, 2015, Plaintiff underwent a consultative medical examination, which was performed by Huey R. Kidd, D.O. (Id. at 334-37). Dr. Kidd noted that Plaintiff was asleep on the exam table when he walked into the room, and that he had to shake Plaintiff to wake him. (Id. at 334). On examination, Dr. Kidd found Plaintiff to be alert, pleasant, and interactive. (Id. at 335). Dr. Kidd also noted that Plaintiff had a regular heart rate, clear lungs, no neurological deficits, completely normal range of motion, and the ability to heel walk, toe walk, and touch his toes and squat without difficulty. (Id. at 335-37). Dr. Kidd diagnosed Plaintiff with sleep apnea and opined that it would be very

difficult for Plaintiff to maintain employment. (Id. at 335).

On November 24, 2015, State agency psychological reviewer Donald E. Hinton, Ph.D. completed a Mental Residual Capacity Assessment. (Id. at 87-89). In the assessment, Dr. Hinton opined that Plaintiff is able to understand, remember, and carry out short and simple instructions, but is moderately limited in his ability to understand, remember, and carry out detailed instructions. (Id. at 88). Dr. Hinton further opined that Plaintiff is not significantly limited in his abilities to perform activities within a schedule, maintain regular attendance and punctuality, sustain an ordinary routine without special supervision, and perform at a consistent pace without an unreasonable number and length of rest periods, but that Plaintiff is moderately limited in his ability to maintain attention and concentration for extended periods. (Id.). Dr. Hinton opined that Plaintiff "is able to concentrate and attend for reasonable periods of time." (Id. at 89). He also opined that Plaintiff has no social interaction or adaptation limitations. (Id.).

On December 21, 2015, Plaintiff received treatment at the Pine Apple Health Center ("Pine Apple"). (Id. at 353). The notes reflect that Plaintiff reported sleep apnea, and that he was "[t]rying to get disability." (Id.). He also reported that he had not seen his neurologist, Walid W. Freij, M.D., in a couple of years because he lost his insurance. (Id.). According to

Plaintiff, he was only awake for about four hours of any given day. (Id.). Plaintiff also reported that he was on no medications. (Id.). On examination, Plaintiff was alert and oriented to time, place, person, and situation, and he exhibited appropriate mood and affect, normal judgment, and normal memory, but poor insight. (Id. at 355). Plaintiff's cardiovascular and respiratory examinations were normal. (Id.). The notes reflect that Plaintiff was counseled on the importance of losing weight, which could improve his breathing during sleep, and was advised to increase physical activity and decrease caloric intake. (Id. at 354). He was also directed to continue to use his CPAP machine at night. (Id.).

Plaintiff returned to Pine Apple for a routine follow-up visit on January 28, 2016. (Id. at 351). He was oriented to time, place, person, and situation but demonstrated inappropriate mood and affect. (Id. at 352). Plaintiff was prescribed methylphenidate (Ritalin). (Id. at 351-52).

Plaintiff presented to Dr. Freij at Neurology Consultants of Central Alabama on February 1, 2016. (Id. at 339). He reported using his CPAP machine every night and feeling refreshed in the morning. (Id.). Plaintiff also reported to Dr. Freij that "he was not taking any naps[,]" and that he "always feels sleepy and tired." (Id.). The notes further reflect that Plaintiff's weight was stable, that he was previously on Ritalin for narcolepsy but

was not on it currently, and that he was currently smoking cigarettes. (Id.). On examination, Dr. Freij noted that Plaintiff was well-developed, looked well-nourished, appeared pain-free and strong, his heart was normal, he had normal breath sounds and no wheezing, he was alert and oriented, his cranial nerves were normal, his sensory and motor examinations were normal, and his gait was normal. (Id. at 339-40). Dr. Freij stressed the importance of weight loss and the continued use of the CPAP machine. (Id. at 340). He also discussed with Plaintiff that he should not operate machines or vehicles while he was sleepy. (Id.). Dr. Freij also noted that Plaintiff needed Provigil or Nuvigil to help him stay awake but could not afford the medication because of lack of insurance. (Id.).

Plaintiff had another follow-up visit at Pine Apple on March 2, 2016. (Id. at 348). The records reflect that Plaintiff was sleeping soundly when the doctor entered the room. (Id. at 348-49). The records also reflect that Plaintiff was oriented to time, place, person, and situation, that he demonstrated appropriate mood and affect, normal memory, and poor insight and judgment, and that he had normal cardiovascular and respiratory examinations. (Id. at 349-50). Plaintiff was prescribed Nuvigil for narcolepsy and instructed to take one tablet every morning. (Id. at 348, 350).

During a follow-up visit at Pine Apple on April 6, 2016,

Plaintiff reported that "Nuvigil ha[d] been very good for him," and it was noted that Pine Apple would try to order more Nuvigil for Plaintiff through patient assistance. (Id. at 357-58). During the visit, Plaintiff complained of depression and a problem with anger management. (Id. at 358). He was prescribed Celexa for depression and directed to "continue daily walks to help depression and [weight] loss." (Id. at 357). On June 7, 2016, Plaintiff was treated again at Pine Apple and complained of fatigue and difficulty concentrating. (Id. at 346). The notes reflect that Plaintiff was still taking Nuvigil and that he had missed his follow-up appointment with Dr. Freij. (Id. at 346, 357). He was counseled on improving his diet and increasing his physical activity. (Id. at 347).

Plaintiff was again treated at Pine Apple on November 29, 2016. (Id. at 357). The records reflect that Plaintiff was not taking any medication other than over-the-counter cold medication and that he was out of Celexa, which he stated did not help his depression. (Id.). A day later, Plaintiff was prescribed Prozac. (Id. at 356). Plaintiff returned to Pine Apple on December 29, 2016. (Id. at 358). The nurse noted: "I met the patient and went over the records from Dr. Freij. If he really wants disability he needs to go back to Dr. Freij and also get another lawyer – I suggested Mr. Coplin in Demopolis - No charge today for advice." (Id.). Plaintiff was again seen at Pine Apple on February 6, 2017.

16

(Id. at 345). The records reflect that Plaintiff was not taking any medication; however, it appears that he was prescribed methylphenidate (Ritalin) during that visit. (Id.).

After over a year absence, Plaintiff next sought treatment from Dr. Freij on March 6, 2017. (See id. at 360). Dr. Freij again noted that Plaintiff reported using his CPAP machine every night, that he was feeling refreshed in the morning, and that he was not taking any naps. (Id. at 360). Plaintiff reported feeling tired in the evening and falling asleep whenever he watched television. (Id.). Dr. Freij further noted that Plaintiff was not taking any medication and was currently smoking cigarettes. (Id.). Plaintiff's cardiac and lung examinations were normal, and he was alert and oriented, had normal cranial nerves, normal sensory and motor examinations, and normal gait. (Id. at 360-61). Dr. Freij instructed Plaintiff to continue using his CPAP machine, discussed weight loss with him, and prescribed Vyvanse for Plaintiff's narcolepsy. (Id. at 361-62).

Plaintiff returned to Pine Apple on May 8, 2017. (Id. at 364). It was noted that Plaintiff was taking medications which included Buspirone for anxiety and Fluoxetine (Prozac) for depression. (Id. at 364-65). With regard to his sleep apnea, Plaintiff was instructed to continue to use his CPAP machine and to keep follow-up appointments with Dr. Freij, and the nurse practitioner noted: "Will see if we can order Vyvanse through

patient assistance that Dr. Friej [sic] wrote for patient." (Id. at 365).

On July 15, 2017, Dr. Freij completed a "Medical Source Statement – Sleep Disorders." (Id. at 366). In the form, Dr. Freij stated that Plaintiff suffered from sleep apnea and narcolepsy, with the associated conditions of airway obstruction and hypertension, for which Plaintiff was currently using a CPAP machine and taking Vyvanse daily, and that before taking Vyvanse, Plaintiff "was tried on Provigil & Ritalin." (Id. at 366-67). Dr. Freij opined that Plaintiff suffered from severe excessive daytime somnolence that was so severe as to prevent work. (Id. at 367).

The ALJ afforded partial weight to Dr. Freij's medical source statement but found Dr. Freij's opinion that Plaintiff could not work due to excessive daytime sleepiness to be inconsistent with the substantial evidence of record, such as Plaintiff's report that the narcolepsy medication Nuvigil had been "very good" for him. (Id. at 21). The ALJ also found Dr. Freij's opinion to be in conflict with his own treatment records, all of which noted that Plaintiff reported feeling refreshed in the morning after using his CPAP machine at night and was not taking any naps. (Id.).

Substantial evidence supports the ALJ's decision to reject Dr. Freij's opinion that Plaintiff cannot work due to excessive

18

daytime sleepiness.  First, the ALJ did not reject all of Dr. Freij's medical records and findings, only the opinion contained in the medical source statement that Plaintiff's daytime somnolence was so severe as to prevent work because it was was not consistent with Dr. Freij's own treatment records or the other record evidence.  During both of Plaintiff's office visits to Dr. Freij, Plaintiff reported that he was not taking any naps and that he felt refreshed in the morning after using his CPAP machine at night.  (Doc. 10 at 339, 360).  These statements flatly contradict the assertion in the medical source statement that Plaintiff cannot work due to severe excessive daytime sleepiness.  While Plaintiff complained of being tired in the evening, Dr. Freij's treatment notes do not indicate that Plaintiff was unable to stay awake or function in the daytime due to excessive sleepiness.  (See id. at 339-40, 360-61).  Second, during Dr. Freij's treatment of Plaintiff in February 2016 and March 2017, Dr. Freij never cautioned Plaintiff against working.  (See id.).  He instead instructed Plaintiff not to operate machinery or drive a vehicle when he felt sleepy.[4]  (Id. at 340).  Additionally, upon examination of Plaintiff, Dr. Freij uniformly found Plaintiff to be alert and oriented, with normal cardiac, lung, neurological, and

---

[4] Both of these restrictions are incorporated in Plaintiff's RFC. (See Doc. 10 at 18).

musculoskeletal function. (Id. at 339-40, 360-61). These findings are generally in line with the other medical evidence in the record, which, as the ALJ noted, typically listed Plaintiff as alert and oriented, with generally normal cardiovascular, respiratory, and musculoskeletal function.

In addition, as the ALJ observed, the record reflects that Plaintiff's narcolepsy was effectively treated with medication, specifically Nuvigil. Indeed, the Pine Apple treatment records relect that Plaintiff took Nuvigil from March through at least June 2016 and reported good results. Plaintiff's assertions that regardless of how effective Nuvigil might be in treating his narcolepsy, it is not effective for him because he cannot afford to purchase it, and that Social Security rules require a claimant's inability to purchase treatment to be considered in determining credibility, miss the mark. (See Doc. 12 at 4-5). Here, the ALJ did not find that Plaintiff was noncompliant with prescribed treatment, nor did she make a credibility finding with respect to why Plaintiff discontinued taking the medication. Instead, she listed the fact that Plaintiff reported that Nuvigil had been "very good" for him as a reason why Dr. Freij's opinion was inconsistent with other record evidence. See Hernandez, 761 F. App'x at 904 (affirming ALJ's decision to give little or no weight to doctors' opinions partly because records showed that claimant's conditions were effectively treated with medication).

The undersigned finds it noteworthy that just one month after Dr. Freij stated in February 2016 that Plaintiff needed Provigil or Nuvigil but could not afford it, Pine Apple assisted Plaintiff in securing Nuvigil and subsequently noted that Plaintiff had good results using the medication. (See Doc. 10 at 340, 348, 350, 357-58). Later, after Dr. Freij prescribed Vyvanse for Plaintiff in March 2017, it was noted in May 2017 that Pine Apple would attempt to order the medication through patient assistance. (Id. at 361-62, 365). Indeed, Dr. Freij's July 2017 medical source statement reflects that Plaintiff was using his CPAP machine and taking Vyvanse daily. (Id. at 366). While Dr. Freij stated in the medical source statement that Plaintiff was suffering from severe excessive daytime somnolence, there are no treatment records from either Dr. Freij or Pine Apple reflecting either that Plaintiff was suffering from excessive daytime sleepiness after beginning Vyvanse or that the Vyvanse was not effective. In sum, the ALJ provided appropriate reasons, supported by substantial evidence, to reject Dr. Freij's opinion that Plaintiff is unable to work.

Substantial evidence also supports the ALJ's decision to accord little weight to the opinion of the consultative medical examiner, Dr. Kidd. As noted supra, Dr. Kidd opined that "it would be very difficult for this man to maintain employment." (Id. at 335). The ALJ determined that Dr. Kidd's statement was not supported by his physical examination of Plaintiff, and that it

was "general and not supported by explanation." (Id. at 21).

Plaintiff argues that the ALJ erred in his assessment of Dr. Kidd's opinion. (Doc. 12 at 5). However, Dr. Kidd's opinion was purely conclusory and he pointed to no medical evidence in support of his opinion. Indeed, Dr. Kidd's physical examination of Plaintiff revealed no neurological deficits, a regular heart rate, clear lungs, normal musculoskeletal findings, and that Plaintiff was alert, pleasant, and interactive. (Doc. 10 at 335). Like Dr. Freij's medical source statement, Dr. Kidd's opinion was at odds with the treatment records of both Dr. Freij and Pine Apple. In view of the foregoing, substantial evidence supports the ALJ's assessment of Dr. Kidd's opinion.

Plaintiff also submitted statements from two of his former employers. (Id. at 227-28, 240-41). The first, signed by Ricky Powell and dated August 24, 2015, stated that Plaintiff was employed by Ricky Powell Trucking as a laborer from January 2013 to January 2014 "but was terminated due to the fact he was unable to perform the required duties because of a sleeping disorder." (Id. at 240). The second, an unsigned and undated typed statement from "Anthony Gwin-OPS Mgr. Advanced Disposal," stated that Plaintiff "worked for Legacy Temp Angency [sic] from 7/1/15 until 7/24/15 and was let go because he was unable to perform duties required because of medical condition." (Id. at 228). The ALJ considered both letters but gave them little weight. (Id. at 22).

With regard to Mr. Powell's letter, the ALJ stated that "it is general and does not give details as to how the sleeping disorder impacted his work. In addition, there is no evidence that Mr. Powell is medically trained to recognize medical signs and symptoms." (Id.) (internal record citation omitted). As to Mr. Gwin's letter, the ALJ noted that Mr. Gwin's statement was vague and did not discuss what the medical condition was or specify how it kept Plaintiff from performing his work duties. (Id.). Although Plaintiff contends that the ALJ erred in affording both of these letters little weight, the only argument he makes in this regard is that "[w]hile it is true Mr. Powell is not medically trained, medical training is not necessary to determine if someone is asleep on the job." (Doc. 12 at 5).

"Although the ALJ should consider evidence from non-medical sources [such as employers], the ALJ is not required to assign the evidence any particular weight." Farnsworth v. Soc. Sec. Admin., 636 F. App'x 776, 784-85 (11th Cir. 2016) (per curiam). "Instead, whether and how much weight the ALJ should give this kind of evidence depends upon the particular facts of the case and a variety of factors, including whether the opinion is consistent with other evidence in the record." Id. at 785.

The Court finds that the ALJ articulated valid reasons for affording the letters of Mr. Powell and Mr. Gwin little weight. Both letters are extremely vague. Mr. Powell stated that Plaintiff

was terminated for being "unable to perform the required duties because of a sleeping disorder[,]" but he provided no elaboration whatsoever, including what Plaintiff's required duties were, what sleeping disorder he was referring to, or specifically how Plaintiff's sleeping disorder impacted his ability to work. (See Doc. 10 at 240). While Plaintiff admits that Mr. Powell has no medical training, he maintains that such training is unnecessary to determine if someone is asleep on the job. (Doc. 12 at 5). However, Mr. Powell did not even go so far as to state that Plaintiff fell asleep on the job; his letter was less specific. Moreover, there are myriad other reasons besides a sleep disorder or medical condition as to why an employee might fall asleep on the job. The ALJ correctly noted that there is no evidence that Mr. Powell has the medical training to diagnose a sleep disorder and distinguish its symptoms from other potential reasons for an employee's sleepiness, and she weighed Mr. Powell's vague statement accordingly.

Mr. Gwin's unsigned letter was even less specific than Mr. Powell's, merely stating that Plaintiff was "unable to perform duties required because of medical condition." (Doc. 10 at 228). As the ALJ pointed out, this statement fails to even hint at what the alleged medical condition was, nor does it describe any of Plaintiff's job duties, explain how the unspecified medical condition prevented Plaintiff from performing those duties, or

provide any rationale to support Mr. Gwin's conclusion that it was a medical condition rather than some other factor that prevented Plaintiff from performing required job duties.

In view of the foregoing, the ALJ correctly considered both former employer letters and determined that they were of little evidentiary value. Therefore, she did not err in assigning little weight to the letters, and Plaintiff's claim must fail.

**VIII.** <u>**Conclusion**</u>

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income be **AFFIRMED**.

**DONE** this **27th** day of **March, 2020**.

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**
